

**FILED**

Aug 30 2017, 5:39 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Thomas W. Farlow
Darren A. Craig
Emily K. Cremeans
Frost Brown Todd, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

George P. Sherman
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Michael Amos,<br>*Appellant-Defendant*,<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff*. | August 30, 2017<br><br>Court of Appeals Case No.<br>49A04-1610-CR-2429<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Lisa F. Borges, Judge<br><br>Trial Court Cause No.<br>49G04-1606-FC-21338 |

**Brown, Judge.**

[1] Michael Amos appeals the trial court's denial of his motion to dismiss the charges against him. Amos raises one issue which we revise and restate as whether the court erred or abused its discretion in denying his motion to dismiss based on the statute of limitations. We affirm.

## Facts and Procedural History

[2] On June 3, 2016, the State filed an affidavit of probable cause and an information charging Amos with sixteen counts of securities fraud, sixteen counts of offer or sale of an unregistered security, and one count of acting as an unregistered broker-dealer, all as class C felonies. The counts for securities fraud and offer or sale of unregistered securities alleged that Amos committed the crimes on or about dates from August 4, 2006, to February 23, 2009. These counts allege that Amos concealed the evidence of his offenses such that evidence sufficient to charge him was not available to the State until no earlier than June 2011, that Amos began in or about March 2009 sending updates to the investors to provide a reason why he was temporarily unable to make promised payments and describe the steps he was taking to fulfill his promises, and the email updates continued approximately monthly and were ongoing as recently as September 6, 2012. The State also alleged that Amos acted as an unregistered broker-dealer from August 6, 2008, to the present.

[3] The State filed an affidavit for probable cause prepared by an investigator for the Indiana Secretary of State, Securities Division, which states the investigator identified two separate schemes involving thirteen investors in Indiana, a promissory note scheme and a real estate investment contract scheme. The

affidavit states that the promissory notes were for a period of time between twelve and one hundred twenty months, each note indicated a specific interest applied to the investor money, most of the notes purport to return thirty-six to forty-eight percent interest annually, the investors viewed the promissory notes as investments, and many of the investors purchased the notes using their individual retirement accounts. The affidavit states that the real estate investment contracts consisted of a sale agreement in which Amos sold property to an investor, a lease agreement in which he would lease the property from the investor immediately after the sale, and a second sale agreement in which Amos would purchase the property back from the investor at the original purchase price at the end of either five or ten years. The lease payments equaled either thirty-six or forty-eight percent of the purchase price per year. The affidavit further states that, from January 2007 until March 2011, Amos received over $13 million from investors nationwide and over $6 million from Indiana investors, that over $2.8 million was spent on personal expenses such as car payments, school fees, student loans, mortgage payments, medical bills, credit card bills, and church donations, and that he returned approximately $1.9 million to Indiana investors. The affidavit states that the promissory notes and real estate investment contract operated as a Ponzi scheme, that Amos would collect substantial upfront principal payments from investors and return a fraction of that money each month, investors were led to believe an actual business existed from which profits were derived, and in reality the enterprise did not have the assets or profits to sustain the scheme.

[4] Additionally, the affidavit of probable cause states that the State of Indiana first became aware of Amos when a Consumer Complaint Form was submitted to the Office of the Indiana Attorney General in June 2011. The affidavit states that Amos concealed his actions from the investors in the manner in which he structured the securities, structured the promissory notes so the principal was not due to be returned to the investor for twelve to one hundred twenty months, and structured the real estate investment contracts so that the investors would not take actual possession of the properties and the investors did not expect to see their principal returned for ten years. The affidavit states that, once Amos failed to pay interest payments and lease payments, "he began, in or about March 2009, sending 'updates,' approximately monthly, to the investors," and "[i]n these 'updates' Amos apologized for missing payments, blamed the missed payment on something beyond his control, and explained his plan for recovery." Appellant's Appendix Volume II at 70. The affidavit states "Amos repeatedly informed investors in these 'updates' that he expected to close a deal soon and then he could send payments" and "[i]nvariably, something beyond Amos' control intervened, the deal could not be closed, and investors were not repaid." *Id.* The affidavit further states that Amos also concealed his actions from the State of Indiana by offering and selling the securities without registering the securities or himself with the Indiana Secretary of State's Office.

[5] On July 12, 2016, Amos filed a motion to dismiss and a supporting brief arguing that the charges again him are barred by the applicable statute of limitations and that the securities fraud charges are deficiently pled. He

maintained that he did not positively act to conceal his actions, the nature of the promissory notes and real estate investment contracts and their maturity or termination dates are clear from the faces of the documents, it was easily ascertainable at the time the documents were signed that he was not a registered agent or broker, and that, if his actions constitute an offense, that offense could have been determined by authorities or the alleged victims on the date the notes and contracts were signed.

[6]     On August 1, 2016, the State filed a response to Amos's motion to dismiss and an affidavit in support. It argued that the structure of the securities prevented the discovery of crimes, and that, "all the way through 2015, [Amos] was sending regular emails to the investors preaching optimism about the prospects of the investments while making no mention of the fact that he had expended vast sums of the invested money for his own personal benefit" and "[t]hese emails fulfilled their intended purpose and delayed investors' discovery of the crime committed until years had passed." *Id.* at 91-92. It also argued that the securities fraud allegations were more than sufficient to place Amos on notice of the nature of the charges against him.

[7]     The affidavit in support of the State's response included several attached investment documents and email messages. On December 1, 2014, Amos sent an email message with the subject "November Update" stating "I hope everyone had a happy thanksgiving, and I am very thankful for all of you," "I am also thankful to be able to report that we are writing up our contract on our commercial transaction, and will be sending it out by the end of the week,"

"[w]e assume the contract will be signed in the next three weeks, which will allow us to begin the due diligence tests required by our money partner," and "[o]nce the contract is signed, we will be able to lock down the timing of the due diligence tests and I will know a more exact date and impact it will have on our recovery." *Id.* at 116. The message stated "[b]elow is our recover outline, I have removed the pending transactions list as I will begin providing close dates by project as we are informed by the lenders," "[i]n this financial environment it is impossible to anticipate when and if a lender or buyer will follow through on previous commitments," and "I hope that this letter will provide you the cautious optimism that I have at this point in regards to our full recovery." *Id.* The message also stated:

> As a reminder our 5 step plan is listed below.
>
> [] Step 1 – Stabilization
>
>> a. We need to close an initial transaction to provide a stable base of income and opportunity to recover.
>>
>> b. Once an initial transaction is closed it will act as a catalyst to other transactions which will accelerate our recovery.
>
> [] Step 2 – Partial Payments . . . As soon as cash flow allows will begin making partial payments to all.
>
> [] Step 3 – Full payments . . . As soon as possible we will resume make full payments
>
> [] Step 4 – Repayment of missed payments . . . Once cash flows allow we will begin repaying any missed payments

[] Step 5 – Buyouts . . . Once cash flows allow, for anyone who wishes, we will accelerate the repurchase of real estate allowing individuals to once again be in a cash position.

*Id.*

On January 3, 2015, Amos sent an email message with the subject "December Update" stating that "[w]e continue to go back and follow on the contract and hoping that we can settle the contract in the next couple of weeks," "[o]nce we got into the holidays things slowed down quite a bit," "[w]e assume the contract will be signed in the next three weeks, which will allow us to begin the due diligence tests required by our money partner," and that he was planning on sending the next update on January 30th. *Id.* at 102. The message also stated "[i]n this financial environment it is impossible to anticipate when and if a lender or buyer will follow through on previous commitments," and "I hope that this letter will provide you the cautious optimism that I have at this point in regards to our full recovery." *Id.* The January 2015 message also included the five-step recovery plan.

On April 8, 2015, Amos sent an email message with the subject "March Update" stating "I was not able to meet with my partner and the money partner in March as they spent most of the month of March in Florida working on other transactions," "[t]hey are scheduled to come back next week and have stated they will meet with me to see if we can come to terms and close the commercial transaction we have been working," "[t]he good news is that I have met with two new money partners and we are in discussions on new

commercial property projects," "I have provided them each several opportunities to review and will be meeting with them this week and next to discuss the next steps," "[t]here is definitely all lot [sic] of activity happening in the last month and my hope is that it leads to a closing very quickly," and that he planned to send the next update on April 30th. *Id.* at 132. The message also stated "[i]n this financial environment it is impossible to anticipate when and if a lender or buyer will follow through on previous commitments," and "I hope that this letter will provide you the cautious optimism that I have at this point in regards to our full recovery." *Id.* The April 2015 message also included the five-step recovery plan.

[10] Amos sent an email message dated September 9, 2015, with a subject line of "September Update," stating "[w]e received some bad, but not completely unexpected news," "[o]ur buyer informed us that Wells Fargo underwriting will not give any value to the signed lease and thus the property will not appraise for the amount the buyer needs in order to qualify for the loan," "[s]ome potential good news is that I have a broker that I am referring to our buyer to that has access to non-bank loans and might still allow us to close the transaction, but will delay our closing," that "[m]y partner also informed me that we have a potential new cash buyer that is showing some interest," and that he would provide an additional update by October 1st. *Id.* at 160. The message again stated "I will begin providing closing dates by project as we are informed by the lenders," "[i]n this financial environment it is impossible to anticipate when and if a lender or buyer will follow through on previous commitments," and "I hope

that this letter will provide you the cautious optimism that I have at this point in regards to our full recovery." *Id.* Also, like the other email messages, the September 2015 message included the five-step recovery plan.

[11] On August 24, 2016, the trial court issued Findings of Fact and Conclusions of Law. The court found in part that, "[a]s recently as September 9, 2015, Amos sent an email to some investors updating them on various problems with a particular investment and stressing 'cautious optimism' in a five-step recovery plan" and that other investors received similar emails. *Id.* at 11. The court concluded that "the State has alleged facts sufficient to justify the tolling of the statute of limitations to, at the earliest, June 10, 2011, the date on which the first complaint against [Amos] was forwarded to the state." *Id.* at 12. The court also concluded the State did not insufficiently plead the securities fraud counts and denied Amos's motion to dismiss. Amos now brings this interlocutory appeal.

## Discussion

[12] The issue is whether the trial court erred or abused its discretion in denying Amos's motion to dismiss the charges against him based upon the statute of limitations. A trial court's denial of a motion to dismiss is reviewed for an abuse of discretion. *Study v. State*, 24 N.E.3d 947, 950 (Ind. 2015), *cert. denied*, 136 S. Ct. 412 (2015). We review a matter of statutory interpretation de novo because it presents a question of law. *Id.*

[13] Amos argues that the statute of limitation expired before the State filed the information against him and that the tolling provision based on concealment is inapplicable because neither the information nor the probable cause affidavit alleges any actions by him to conceal the commission of a crime. He argues that charging documents do not allege that he threatened the alleged victims to prevent them from reporting the offenses to the Indiana Secretary of State or that he manipulated financial records or other documents related to the notes and contracts. He asserts the nature of the notes and contracts and their maturity and termination dates are clear from the faces of the documents, that it was easily ascertainable at the times the documents were signed that he was not a registered agent or broker, and that he did nothing to keep the authorities from learning of the alleged offenses or to prevent them from investigating it. He also argues that the "alleged 'updates' were not provided to authorities and would not have affected the ability of investigating authorities to discovery [sic] any of the alleged offenses, as required for the concealment-tolling provision." Appellant's Brief at 11.

[14] The State maintains that Amos sold unregistered securities that he structured to mature years later, an investor would have had no reason to believe that a crime occurred until the securities matured and the investor was not paid, the State could not know a crime had occurred because Amos was not registered and did not register the securities and the unregistered transactions occurred between two private parties, and, "[i]n other words, by structuring the securities in the manner that he did and by failing to register, Amos took positive steps to

conceal the fact that criminal activity was occurring." Appellee's Brief at 11. The State asserts that the charging documents and accompanying probable cause affidavit alleged that Amos was engaged in a Ponzi scheme, that he concealed this fact by informing investors that he was temporarily unable to make promised payments but was taking steps to fulfill his promises, that "[t]hrough his communications with investors, Amos sought to lull investors into complacency by sending regular updates in which [he] expressed his 'cautious optimism' about the viability of the investments" and "claimed that 'he expected to close a deal soon[,]' which would allow him to continue sending payments," and that "[t]hese emails fulfilled their intended purpose of allaying potential concerns of investors and delaying the discovery of the crimes committed until years had passed." *Id.* at 11-12.

With respect to Amos's assertion that the charging documents fail to allege concealment because they do not allege he threatened the alleged victims, the State's position is that "in this context, threatening an investor would be counterproductive and more likely to cause the investor to become suspicious and report the person making the threats to authorities," "[a] more effective concealment strategy, as evidenced by the allegations here, is to attempt to alleviate investors' potential concerns by falsely reassuring them that there has only been a temporary setback and payments will resume again in the not too distant future," and "[t]his strategy is much more likely to lull investors into a false sense of security and delay discovery that criminal activity is taking place." *Id.* at 13-14. The State also argues that, "[s]ince Amos's investors were

dependent on him for information regarding their investments, [his] communications served to conceal the criminal nature of the investments from the investors" and "Amos's acts of concealment were so effective that most of the investors never realized that they might be victims of a crime until approached by authorities." *Id.* at 14.

[16] Indiana Code § 35-41-4-2(a) provides that a prosecution for an offense is barred unless it is commenced "within five (5) years after the commission of the offense, in the case of a . . . Class C . . . felony (for a crime committed before July 1, 2014) . . . ." Indiana Code § 35-41-4-2(h) provides in part:

> The period within which a prosecution must be commenced does not include any period in which:
>
> * * * * *
>
> (2) the accused person conceals evidence of the offense, and evidence sufficient to charge the person with that offense is unknown to the prosecuting authority and could not have been discovered by that authority by exercise of due diligence . . . .

[17] The primary purpose of statutes of limitations is to protect defendants from the prejudice that a delay in prosecution could bring, such as fading memories and stale evidence. *Study*, 24 N.E.3d at 953. Statutes of limitations are also intended to strike a balance between an individual's interest in repose and the State's interest in having sufficient time to investigate and build its case. *Id.* Any exception to the limitation period must be construed narrowly and in a light most favorable to the accused. *Id.*

[18]     The State filed the charging information and the affidavit of probable cause on June 3, 2016. The counts for securities fraud and offer or sale of unregistered securities alleged that Amos committed the crimes on or about dates from August 4, 2006, to February 23, 2009, and the count for acting as an unregistered broker-dealer alleged Amos committed the crime between August 6, 2008, and the present, and all of the charged counts constitute class C felonies.

[19]     The Indiana Supreme Court has held: "The application of the concealment-tolling provision under Indiana Code § 35-41-4-2(h)(2) requires a positive act by the defendant that is calculated to conceal the fact that a crime has been committed." *Id.* at 957. The Court has also observed: "Obviously, proof of 'concealment' . . . is a fact-intensive issue." *Willner v. State*, 602 N.E.2d 507, 509 (Ind. 1992). The parties cite *Study*, 24 N.E.3d 947, *Kifer v. State*, 740 N.E.2d 586 (Ind. Ct. App. 2000), *State v. Chrzan*, 693 N.E.2d 566 (Ind. Ct. App. 1998), and *Dvorak v. State*, 78 N.E.3d 25 (Ind. Ct. App. 2017)*, trans. pending*.[1]

[20]     In *Study*, the State charged John Study with several counts of robbery, and Study moved to dismiss one of the counts on the grounds it was barred by the statute of limitations. 24 N.E.3d at 948-949. The charging information alleged that "concealment occurred when Study concealed his identity by wearing a mask, and concealed the getaway car, clothes worn during the crime, items

---

[1] Amos filed a notice of additional authority citing *Dvorak* as the opinion was published following the filing of the parties' briefs.

taken from a victim, the weapon used, and evidence linking the robbery to other robberies." 24 N.E.3d at 954. The Court observed that "[n]one of these actions would serve to prevent law enforcement from discovering that a bank had been robbed," "[t]he State's ability to investigate the crime and develop a case was not thwarted," "[l]aw enforcement officials discovered the robbery and were able to begin investigating immediately," and "[t]herefore, the State's interest was sufficiently served as there was nothing delaying their ability to investigate." *Id.* The Court also stated:

> If concealment of guilt is all that is required to toll the statute of limitations, it is hard to imagine when the concealment-tolling provision would not apply. In almost every criminal case, the offender is going to attempt to conceal that they have committed the offense. Under that reading, in order to avoid tolling the statute of limitations, a criminal defendant would have to leave incriminating evidence at the crime scene or deliver it to police. Should the statute be read to require that Study turn over the getaway car or return items stolen from a victim in order to avoid tolling? As Judge Mathias stated, allowing any concealment of guilt to toll the statute of limitations would "vitiate[ ] this public policy in all but very few crimes, leaving us with an effectively meaningless statute of limitations." *Study*, No. 06A04-1308-CR-391, Slip Op. at *16. We agree that the exception cannot be read to swallow the rule.
>
> This is not to suggest that the concealment-tolling provision would never be applicable in the instance of a robbery. For example, an individual may rob a jewelry store and threaten the employee into forging sales receipts and altering accounting documents to make it appear as if no robbery had occurred. After the robbery, the offender may continue sending threatening mail or messages to the employee to not report the robbery. In this instance, the criminal would have taken positive actions to

conceal that a robbery had occurred, which would inevitably result in some delay before law enforcement could commence an investigation. Allowing the statute of limitations to run in this scenario would function as a windfall to the defendant and unduly burden the State's ability to build a case and bring charges. As such, the application of a tolling provision is warranted.

However, here, there is no dispute that the police were aware that the bank robbery on March 21, 2006 had occurred. The police immediately began investigating and even discovered the connections between the March 21, 2006 robbery and subsequent robberies for which Study was eventually charged. Thus, even Study's attempts to conceal his guilt were not thwarting the progress of the police investigation.

*Id*. at 956-957. The Court noted that "the concealment, to avoid the running of the statute, must be of the crime itself," *id.* at 957 (citing *State v. Hoke*, 84 Ind. 137, 138 (1882)), and that Indiana courts have continued to hold that concealment tolls the statute of limitations only when there is a positive act performed by the defendant that is calculated to prevent the discovery that a crime has been committed. *Id.* (citations omitted). The Court concluded that "Study did not engage in any positive act calculated to conceal the fact that a robbery occurred on March 21, 2006" and that therefore the statute of limitations as to that offense was not tolled and the charge should have been dismissed. *Id.* at 957-958.

[21]    In *Kifer*, in October of 1987 David Kifer left the scene of an accident in which he struck and killed a jogger and later removed his license plates and headlight rings from his car and sold it to a salvage yard. 740 N.E.2d at 586-587. In

September 1997, police received a tip that Kifer had been the driver, and after investigation the State charged Kifer in September 1999. *Id.* at 587. Kifer moved to dismiss the charge based on the statute of limitations, and the trial court denied the motion. *Id.* On appeal, this Court found that Kifer concealed evidence of his guilt by altering and disposing of the car involved in the accident but did not conceal the fact that a crime had been committed, it was undisputed that the police were aware in October 1987 that a fatal hit and run accident had occurred, and therefore the commission of the offense was fully known in 1987 and the State's prosecution of Kifer twelve years later was barred by the statute of limitations. *Id.* at 588.

[22] In *Chrzan*, Chester Chrzan resigned as manager of a grain elevator effective January 13, 1994, and on January 18, 1994 contacted Martin, his replacement as the elevator manager. 693 N.E.2d at 567. Chrzan wrote two checks totaling $16,000 and gave them to Martin, told Martin the checks were payment for beans that he bought, and later Martin thought that something was amiss in that there may have been double payment for the beans and there was a shortage of beans stored at the elevator. *Id.* Martin did not advise anyone about his thoughts and started an investigation. *Id.* The corporate directors of the elevator met with Chrzan in May of 1994 and again in September as a part of an audit, and it developed that Chrzan had secreted $12,000 to $15,000 for use in the event he was fired as manager. *Id.* A settlement negotiation between the directors and Chrzan failed. *Id.* The directors approached the prosecutor about the matter in the spring of 1995, and the prosecutor filed charges of

misappropriation of funds and the knowing use of a false measure as misdemeanors against Chrzan on January 16, 1996, which was three days after two years had passed since Chrzan resigned as manager. *Id.* at 566-567. The trial court granted a motion to dismiss the charges, holding that the two-year statute of limitations barred prosecution. *Id.* at 566. On appeal, this Court noted that the concealment of facts that an offense has been committed must be the result of the defendant's positive acts and that positive acts of concealment include the threat of bodily harm and the existence of a coercive relationship. *Id.* at 567. We further noted the State's argument that Chrzan's manipulation of financial records during the two years prior to his resignation as manager, and the writing of the two checks on January 18, 1994, were positive acts of concealment as contemplated by the statute, and held "[w]e agree that these acts were positive acts on the part of the perpetrator to conceal the fact that a crime had been committed," and reversed the court's ruling on the motion to dismiss. *Id.*

[23] In *Dvorak*, the State charged Dvorak in June 2015 with offer or sale of an unregistered security and acting as an unregistered agent as class C felonies, and the information alleged that Dvorak committed the illegal acts on or about July 9, 2007. *Dvorak*, 78 N.E.3d at 26-27. Dvorak filed a motion to dismiss arguing the charges were barred by the statute of limitations and that the statute of limitations was not tolled, and in response the State argued that Dvorak concealed the offenses by structuring the securities to mature three years later resulting in the alleged victim having no reason to believe that a crime occurred

until those securities matured. *Id.* at 27. The trial court denied Dvorak's motion to dismiss. *Id.*

[24] On appeal, Dvorak argued that there were no allegations of any positive act that he committed to conceal the fact that an offense had been committed, and the State argued that "Dvorak's structuring of the unregistered security included the selection of a maturity date that would cause his illegal activity to fly under the radar for three years after the illegal sale." *Id.* at 29. This Court held that "Dvorak points out, however, that whether he was registered to offer or sell securities and whether the security was registered were matters of public records on the date of the alleged offenses," the alleged victim "could have determined those facts at the time he entered into the agreements," and "[t]he maturity date of the agreements did not prevent [the alleged victim] from determining that Dvorak and the securities were unregistered." *Id.* The Court also observed that the State had noted that failing to disclose that a security is not registered and that a seller is not registered as a broker-dealer has been found to be a material omission on the part of the seller. *Id.* (citing *Manns v. Skolnik*, 666 N.E.2d 1236, 1249 (Ind. Ct. App. 1996), *trans. denied*). The Court observed that *"Manns* dealt with fraud allegations against the defendant in the context of an administrative complaint, and the omission was relevant to the fraud determination," that "[i]n the context of concealment tolling the statute of limitations in a criminal case, our courts have held that a 'positive act' to conceal the fact that an offense has been committed is required," *id.* at 30 (citing *Study*, 24 N.E.3d at 952), and that "[t]he omission discussed in *Manns* is not, however, a 'positive act,' which

is necessary to toll the statute of limitations." *Id.* We concluded that Dvorak did not engage in any positive act calculated to conceal the fact that he was not registered and the security was not registered with the Secretary of State and that the trial court erred in denying Dvorak's motion to dismiss. *Id.*

[25] In addition, we are mindful that Amos has brought this interlocutory appeal from the denial of his motion to dismiss based on the statute of limitations and that, in *Woods v. State*, this Court held: "The State must only make sufficient allegations in the charging information that the alleged crimes fall within the statute of limitations; whether the State has actually met its burden of proving that the alleged crimes fall within the statute of limitations is a question for trial." 980 N.E.2d 439, 442 (Ind. Ct. App. 2012) (citing *Reeves v. State*, 938 N.E.2d 10, 15-16 (Ind. Ct. App. 2010), *reh'g denied, trans. denied*). We further said that the State must plead the circumstances of the concealment exception in the charging information, that pleading must contain sufficient facts so that the defendant is apprised of the facts upon which the State intends to rely and may be prepared to meet that proof at trial, and the information must also state the date of the offense with sufficient particularity to show that the offense was committed within the period of limitations applicable to that offense. *Id.* at 442-443 (citing *Reeves*, 938 N.E.2d at 15-16 ("Indeed, the State has the burden at trial of establishing that the crime charged was committed within the statute of limitation. However, as this is an interlocutory appeal from a motion to dismiss, we deem that the more appropriate issue at hand is whether the State has met its initial burden of making sufficient allegations in the charging

information that the offenses were committed within the applicable statute of limitation.") (citation omitted); *Willner*, 602 N.E.2d at 509; Ind. Code § 35-34-1-2(a)(5)[2]).

[26] In this case, the counts charging Amos with securities fraud and offer or sale of unregistered securities alleged that he concealed the evidence of his offenses such that evidence sufficient to charge him was not available to the State until no earlier than June 2011, and that Amos began in or about March 2009 sending updates to the investors to provide a reason why he was temporarily unable to make promised payments and describing the steps he was taking to fulfill his promises. In addition, the affidavit of probable cause says that the State first became aware of Amos when a complaint was submitted to the Indiana Attorney General in June 2011. The affidavit further states that Amos began sending email updates to investors "approximately monthly," "[i]n these 'updates' Amos apologized for missing payments, blamed the missed payment on something beyond his control, and explained his plan for recovery," "Amos repeatedly informed investors in these 'updates' that he expected to close a deal soon and then he could send payments," and "[i]nvariably, something beyond Amos' control intervened, the deal could not be closed, and investors were not repaid." Appellant's Appendix Volume II at 70.

---

[2] Indiana Code § 35-34-1-2(a) provides that "[t]he indictment or information shall be in writing and allege the commission of an offense by: . . . (5) stating the date of the offense with sufficient particularity to show that the offense was committed within the period of limitations applicable to that offense . . . ."

[27] With respect to the counts of securities fraud and offer or sale of an unregistered security, we conclude that the State has pled the circumstances of the concealment exception in the charging information and the information contains sufficient facts, namely, that Amos began sending updates to the investors in or about March 2009 to provide a reason why he was temporarily unable to make promised payments and describe the steps he was taking to fulfill his promises, such that Amos was apprised of the facts upon which the State intends to rely and may be prepared to meet that proof at trial. *See Woods*, 980 N.E.2d at 442. Even assuming that Amos's structuring of the notes and contracts to mature after the statute of limitations had run does not toll the statute of limitations, we observe that Amos sent regular email messages to the investors as set forth in the charging information and the affidavit of probable cause and that these messages essentially assured investors that he had a plan to recover their investments and was working with additional brokers, partners, lenders, and investors to do so. These regular communications, in light of their content, assurances, and requests for patience, may be determined to have been Amos's attempt to delay or prevent the discovery of his commission of the alleged crimes of securities fraud and offer or sale of an unregistered security and thus constituted positive acts of concealment for purposes of tolling the statute of limitations. *See Chrzan*, 693 N.E.2d at 567 (finding in part that Chrzan's actions of writing two checks and telling a manager they were payment for beans he had bought constituted a positive act to conceal the fact a

crime had been committed).[3] At a minimum, the State has pled sufficient facts in its information that the alleged crimes fall within the statute of limitations, and the trier of fact may ultimately determine at trial whether the State has actually met its burden of proving that the alleged crimes fall within the statute of limitations. *See Woods*, 980 N.E.2d at 442 ("The State must only make sufficient allegations in the charging information that the alleged crimes fall within the statute of limitations; whether the State has actually met its burden of proving that the alleged crimes fall within the statute of limitations is a question for trial."). As for the count of acting as an unregistered broker-dealer, the charging information alleges that, "[o]n or about and between August 6, 2008 *and the present*," Amos transacted business as a broker-dealer with certain individuals without being registered with the Indiana Secretary of State as required, Appellant's Appendix Volume II at 52 (emphasis added). Thus, prosecution for the alleged crime, to the extent the crime occurred after the date five years prior to the filing of the charging information, is not barred by Indiana Code § 35-41-4-2(a).[4] Based upon the record, we conclude the trial court did not err in denying Amos's motion to dismiss.

---

[3] Unlike in *Study* and *Kifer*, where police were fully aware a crime had occurred soon after the crimes were committed, in this case the State claims it first learned of Amos's actions when a complaint was submitted to the Office of the Indiana Attorney General in June 2011.

[4] Also, Amos does not argue that the charging information for the count of acting as an unregistered broker-dealer is deficiently pled. This count does not allege that Amos engaged in any positive act calculated to conceal the fact he was not registered with the Indiana Secretary of State.

## *Conclusion*

[28]     For the foregoing reasons, we affirm the trial court's denial of Amos's motion to dismiss.

[29]     Affirmed.

May, J., and Pyle, J., concur.